UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLORIA E. SINGLETON,

    Plaintiff,

     v.

JOHN E. POTTER, Postmaster General,
United States Postal Service,

    Defendant.

Civil Action No. 03-1276 (CKK)

**MEMORANDUM OPINION**
(July 22, 2005)

Plaintiff, a longtime EAS-9 secretary in the Employee Development Department of the

United States Postal Service, brings this employment discrimination case pursuant to the Age

Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), alleging that Defendant

("Defendant" or "the Postal Service") (1) "knowingly and willingly" discriminated against her on

the basis of her age when failing to offer her the position of training specialist EAS-21 in 2001;

(2) retaliated against her upon her submission of a complaint with the EEOC office; and (3)

created a hostile work environment full of continual surveillance and repeated harassment.

Currently before the Court is Defendant's Motion for Summary Judgment, which contends that

summary judgment is appropriate with respect to Plaintiff's claims because (1) the Postal Service

had legitimate, non-discriminatory reasons for not selecting Plaintiff for the promotion at issue,

and Plaintiff cannot show the requisite pretext that the Postal Service failed to promote her on the

basis of her age; and (2) Plaintiff failed to exhaust her retaliation and hostile work environment

claims and, in any event, cannot establish a *prima facie* case to support either allegation.

Upon a searching examination of Defendant's motion, Plaintiff's Opposition,

Defendant's Reply, the relevant case law, and the entire record herein, the Court shall grant

Defendant's Motion for Summary Judgment and dismiss the above-captioned action.

## I: BACKGROUND

Plaintiff Gloria Singleton is a longtime employee of the Postal Service who was initially

hired in 1986.  *See* Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 76.  In 1990, Plaintiff was transferred

to the Postal Service Headquarters in Washington, D.C., and later promoted to senior word

processor.  *See* First Am. Compl. ¶¶ 17-18.  In 1996, Plaintiff was placed in the Employee

Development Department at Headquarters.  *Id.*; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 77, 81.  In

the Employee Development Department ("the Department"), Plaintiff worked as a level EAS-9

secretary, wherein her responsibilities included handling administrative duties and assisting team

leaders in the Department.  Def.'s Stmt. of Mat. Facts Not in Dispute ("Def.'s Stmt.") ¶ 3; Pl.'s

Stmt. of Facts that Remain in Dispute Necessitating the Denial of Def.'s Mot. for Summ. J.

("Pl.'s Stmt.") ¶ 3.  During a roughly two month period from January 6, 2001, until March 2,

2001, Plaintiff was detailed into a EAS-21 "Training Specialist" position as a developmental

assignment.  Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.  During this developmental detail, Plaintiff's

responsibilities included handling administrative duties, as well as engaging in some budgetary

duties that consisted of monitoring the expenses for the Department.  *Id.*  Plaintiff's budgetary

duties in her detail did not involve the preparation of budgets or decision-making responsibilities.

Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.

*A.*     *Non-Selection*

In early 2001, Plaintiff applied for a permanent position as an EAS-21 Training

2

Specialist. Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7. At the time of Plaintiff's application, she was fifty-five (55) years old. Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10. The only other applicant for the position was Ms. Joyce Ghu, who was thirty-four (34) years old at the time of her application. Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 11. At the time of the announcement, Ms. Ghu worked in an EAS-14 position in the Workplace Environment Department at Postal Service Headquarters handling administrative responsibilities, and had been with the Postal Service for roughly four (4) years. Pl.'s Opp'n, Ex. 2 (Dep. of William Koukos, EAS-25 team leader and selecting official) ("Koukos Dep.") at 27:1-19; Def.'s Mot. for Summ. J., Ex. 1 (Koukos Dep.) at 33:19-22. The vacancy announcement for the EAS-21 Training Specialist position described the responsibilities of the position as including "development programs, corporate training objectives, evaluation training, and development issues." Pl.'s Stmt. ¶ 6 (citing Koukos Dep. at 24:20-25:3). While the words "budget" or "budgeting issues" were not directly listed under either the responsibilities or requirements of the position in the vacancy announcement, Pl.'s Opp'n, Ex. 2 (Koukos Dep.) at 24:12-19, 26:5-8, included among the functional purposes explicitly named was "analysis," *id.* at 24:12-16, and included among the seven requirements identified on the announcement for the position was "contracting officer representatives," *id.* at 26:3-4.

Mr. William Koukos, a level EAS-25 team leader who indirectly supervised Plaintiff, was the selecting official for the EAS-21 Training Specialist position, while Ms. Carol Aspengren was the approving official for the position. Def.'s Stmt. ¶¶ 8-9; Pl.'s Stmt. ¶¶ 8-9. After both candidates were interviewed by Mr. Koukos, *see* Def.'s Mot. for Summ. J, Ex. 1 (Koukos Dep.) at 33, Ms. Ghu was selected for the Training Specialist position on March 2, 2001. Def.'s Stmt. ¶ 11; Pl.'s Stmt. ¶ 11. According to Mr. Koukos, Ms. Ghu was chosen for two major reasons.

Def.'s Stmt. ¶ 13.  First, he believed that Ms. Ghu's qualifications were superior to those of Plaintiff.  *Id.*; *see also* Def.'s Mot. for Summ. J, Ex. 1 (Koukos Dep.) at 33.  Specifically, he felt that Ms. Ghu was "just a brighter individual" with better "[o]verall work experience and background," *id.*, especially given the fact that -- in contrast to Plaintiff, who did not have a college degree, Def.'s Stmt. ¶ 13; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 70 -- Ms. Ghu was a college graduate with a degree in finance.  *See* Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 70-71.  In contrast, Mr. Koukos understood that Plaintiff's primary responsibilities in her limited EAS-21 detail included handling administrative matters and providing support to the EAS-21 position, and that while she monitored expenses for the Department, Plaintiff was not involved in the preparation of budgets or decision-making responsibilities.  Def.'s Stmt. ¶ 14 (citing Def.'s Mot. for Summ. J., Ex. 1 (Koukos Dep.) at 14-21; Ex. 2 (Singleton Dep.) at 61-63, 67); *see also* Pl.'s Stmt. ¶ 14 (adding that her EAS-9 "responsibilities included training activities and employee development").

Second, Mr. Koukos was aware of Plaintiff's "attendance issues," and indicated that Plaintiff's attendance problems had a "significant impact" on the selection decision.  Def.'s Stmt. ¶ 17; Def.'s Mot. for Summ. J., Ex. 1 (Koukos Dep.) 48:2-14; *see also* Pl.'s Stmt. ¶ 17 (noting that, "[a]t times plaintiff arrived at work late but she would nonetheless arrive at work").  Plaintiff currently resides in Baltimore, Maryland, and did so during the relevant period in question.  Def.'s Stmt. ¶ 18; Pl.'s Stmt. ¶ 18.  As such, her commute to the Postal Service's Headquarters in Washington, D.C., was often approximately two to two and a half hours.  *Id.*; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 5-7.  Due to the length of her commute, Plaintiff was frequently tardy to work, even "a couple of times a month, at least" by her own

admission.  Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.)

at 7; *see also* Def.'s Mot. for Summ. J., Ex. 1 (Koukos Dep.) at 61:7-62:3 (noting that he

discussed orally Plaintiff's tardiness problems with her "[e]very week, a couple of times a week"

for "[a] good part of the detail"); Def.'s Mot. for Summ. J., Ex 5 (Decls. of Messrs. James French

and Charles Johnson) at ¶ 3, 1 (noting that "[f]rom January 2001 through March 2003," each

individual had "observed Gloria Singleton reporting late for work once or twice every week,"

that "it was not uncommon for Gloria to be an hour or more late for work," and that her

"supervisors had several conversations with her regarding her poor attendance").  Even after the

Postal Service had accommodated Plaintiff's long commute and frequent tardiness by changing

her starting time from 8:00 a.m. to 9:00 a.m., Plaintiff continued to arrive tardy.  *Id.*  In contrast,

Ms. Ghu -- who resided in Richmond, Virginia, during 2001 -- had a reputation for arriving to

work everyday on time despite her lengthy commute.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.

 After Plaintiff's non-selection, which was announced on March 2, 2001, Plaintiff filed a

charge of discrimination against the Postal Service with the EEO Compliance and Appeals in

Washington, D.C, on March 12, 2001.  First Am. Compl. ¶ 9.  Plaintiff felt that "age was a

determining factor in her not being selected by the Defendant for the position for which she had

applied."  *Id.* ¶ 27.  Specifically, Plaintiff stressed that she "had experience in training, employee

development, and curriculum longer than Ms. Ghu had been with the [P]ostal [S]ervice," she

"had been detailed into this very same position prior to not being selected for the permanent

position," and "[a]fter Ms. Ghu was placed in the position, she constantly sought help from the

plaintiff and she was told by Mr. Koukos to help her."  Pl.'s Stmt. ¶ 14.  However, as Plaintiff

noted at her deposition, she did not hear anyone in the Department's management indicate that

they wanted someone younger than her for the permanent EAS-21 position.  Def.'s Stmt. ¶ 16;

Pl.'s Stmt. ¶ 16; Def.'s Mot. for Summ. J., Ex 2 (Singleton Dep.) at 87.

Given the above-mentioned facts, Count I of Plaintiff's First Amended Complaint alleges

that the Postal Service "knowingly and willingly discriminated against the plaintiff on the basis

of her age in violation of the ADEA" when it declined to offer her the permanent position as an

EAS-21 Training Specialist.  First Am. Compl. ¶ 41.  According to Plaintiff, "[a]s a result of the

discriminatory conduct of the defendant," she has suffered "lost wages," "that being the salary

that she would have earned in the EAS-21 position had it been offered to her in 2001 as opposed

to the salary she continued to earn upon not being offered the position."  *Id.* ¶ 42.

> B.     *Retaliation and Hostile Work Environment*

After Plaintiff's non-selection to the EAS-21 Training Specialist position, Plaintiff began

to perform secretarial duties for Mr. William Stefl in addition to her preexisting responsibilities

"right after March 2001."  Def.'s Stmt. ¶ 22; Pl.'s Stmt. ¶ 22; Def.'s Mot. for Summ. J., Ex. 2

(Singleton Dep.) at 17:15-25.  Due to a reduction in force, Mr. Stefl no longer had a personal

secretary, and Plaintiff and Ms. Cheryl Seay were left as the only secretaries in the unit, which

consisted of approximately 30 people.  *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. 2 (Singleton

Dep.) at 22:15-25.  Plaintiff alleges that, at this time, Ms. Aspengren told Plaintiff that "she did

not appreciate that [Plaintiff] filed the [EEO] complaint."  First Am. Compl. ¶ 28; Def.'s Mot.

for Summ. J., Ex. 2 (Singleton Dep.) at 24:18-23.  After this statement, Plaintiff contends that

she was subjected to near-constant retaliation and a hostile work environment, as made apparent

in nine separate incidents.  *See* First Am. Compl. ¶¶ 28-39.

First, Plaintiff asserts that both Ms. Aspengren and Plaintiff's post-January 2003 supervisor, Mr. Ronald Worthy, increased her workload "in comparison to other employees in comparable positions" and gave her work that was the responsibility of others.  *Id.* ¶¶ 29-30, 32. Plaintiff contends that the workload increase was such that she was forced to eat lunch at her desk "[a]lmost every day" in order to meet the workload demands.  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 89:16-23.  However, Plaintiff admits that she was able to complete all of the work assigned to her during her regular work hours, Def.'s Stmt. ¶¶ 23, 34; Pl.'s Stmt. ¶¶ 23, 34; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 101-02, and concedes that she did not know the extent of the secretarial responsibilities and duties of her counterpart, Ms. Seay, because Ms. Seay "sat at the other side of the office" and Plaintiff "couldn't see her, physically see her."  Def.'s Stmt. ¶ 23; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 89:9-15.

Second, Plaintiff alleges that on March 23, 2001, Mr. Koukos and she engaged in a conversation at her desk.  Pl.'s Stmt. ¶ 40; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15-16.  When speaking about an employee out on "sick leave" named "Jane," who was approximately one (1) year younger than Plaintiff, Mr. Koukos purportedly stated to Plaintiff:  "When you get up to that age, also, you start having problems."  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15:2-3.  Plaintiff, during her deposition, stated that because she's "a year younger than Jane," she felt like "that's a reference to my age."  *Id.* at 15:4-5.

Third, Plaintiff asserts that Mr. Dale Ellis notified her that he wanted to give her a $100 spot bonus in September 2001 as an "award for something I did for him."  First Am. Compl. ¶ 31; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 19:5-10.  However, according to Plaintiff, Mr. Ellis told her that Ms. Aspengren intervened, and "wound up saying, 'Just give her $50.'"  Pl.'s

Opp'n, Ex. 1 (Singleton Dep.) at 19:7-8.  As such, Plaintiff received only a $50 spot bonus, not

the $100 spot bonus originally planned by Mr. Ellis.  *Id.* at 19:5-10.

Fourth, Plaintiff contends that in late 2001, whenever she arrived at work late or got out

of her seat, Ms. Aspengren made a notation to that effect in a calendar that she kept in her office.

Pl.'s Stmt. ¶ 45; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 22:2-14.  According to Plaintiff, Ms. Seay

showed her the calendar with the notations.  Pl.'s Stmt. ¶ 45; Pl.'s Opp'n, Ex. 1 (Singleton Dep.)

at 25:11-16.  Plaintiff contends that even though other employees sometimes were late for work,

no other employees had their arrival times listed on Ms. Aspengren's calendar.  *Id.*  During this

same general time period, Plaintiff also alleges that Mr. Koukos would "stand over the individual

who recorded [P]laintiff's time and attendance at work and yet he did not do that for any other

employees."  Pl.'s Stmt. ¶ 45.  According to Plaintiff, she believed that Mr. Koukos was "just

checking up on me . . . . Scrutinizing me . . . . Just to make it more hostile to me."  Pl.'s Opp'n,

Ex. 1 (Singleton Dep.) at 48:4-10.

Fifth, Plaintiff believes that she applied for an EAS-11 secretarial position vacated by Ms.

Seay upon her retirement in November 2001.  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24.  However,

Plaintiff admits that she cannot recall being interviewed for that job.  *Id.*; *see also* Def.'s Mot. for

Summ. J., Ex. 2 (Singleton Dep.) at 40:1-5.  According to Plaintiff, despite Ms. Aspengren's

animus towards her, Ms. Aspengren promised this position to Plaintiff "[r]ight before Cheryl

retired in November."  *Id.* at 40:13-15.  However, by early 2002, Plaintiff discovered that Ms.

Anita Nash had been given the position.  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24.  When Plaintiff

questioned this decision, she claims that she was told by Mr. Koukos:  "Sorry about that, we had

to give it to her . . . because she was RIFed."  Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at

8

40:16-41:7 (meaning that, as Plaintiff explained, Ms. Nash's old job was subject to a "reduction in force" but this decision allowed the Postal Service to keep her as an employee). When Plaintiff was asked to explain her basis for concluding that she did not get the job in retaliation for filing an EEO complaint, she simply stated: "I feel they did that just for reprisal." Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 40:18-19.

Sixth, after Mr. Worthy became Plaintiff's supervisor in January 2003, she contends that he asked her to clean out cubicles for new employees on three different occasions -- a request made to no other comparable employee. Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 133:23-134:4; *see also* Pl.'s Stmt. ¶ 48. According to Plaintiff, "I'm not a janitor . . . . I would think that the computer people would take the computers out and the maintenance people would come up and clean it out. Not me, clean drawers and stuff." *Id.* at 144:14-19. However, Plaintiff did note that this task included preserving some material, such as "[p]apers and stuff that was left [in the desk drawers] from whoever was sitting there, and the books, and putting them somewhere, and cleaning it up." *Id.* at 144:21-23. Plaintiff indicated that she kept "what I thought was to keep, like, if they were books or manuals for training" that the maintenance people would have otherwise thrown out. *Id.* at 145:5-13.

Seventh, Plaintiff contends that she was treated differently by Mr. Worthy with respect to annual leave. Plaintiff notes that after she missed three (3) days of work due to a bursitis condition in her leg, and used annual (rather than sick) leave to cover the missed time, Mr. Worthy required her to bring a doctor's note -- a requirement that he did not enforce for "any other employees in the [D]epartment." Pl.'s Stmt. ¶ 47.

Eighth, Plaintiff claims that she suffered further retaliation and hostility when, on March 6, 2003, she requested a temporary assignment appointment to an EAS-21 Training Development Specialist position that had recently been vacated.  First Am. Compl. ¶ 33; Def.'s Stmt. ¶ 27; Pl.'s Stmt. ¶ 27.  According to Plaintiff, Mr. Worthy called her into his office and indicated to her that he would not detail her into the EAS-21 position because "he was going to fill it fairly quickly" and had no need for a temporary detail.  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 124:18-22; Def.'s Stmt. ¶ 28; Def.'s Mot. for Summ. J. (Ex. 3) (Worthy Dep.) at 24-25.  Plaintiff further indicated in her deposition that Mr. Worthy also told her that she "should just retire" and that "he wouldn't give me a 21 job anyway."  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 124:18-22; *see also* Pl.'s Stmt. ¶ 41; First Am. Compl. ¶ 35 ("Mr. Worthy further informed Ms. Singleton that she wasn't committed enough, should just consider retiring and wouldn't give Plaintiff the position even if she put in for it.").

In his deposition, Mr. Worthy told a slightly different story:

> As I recall a couple of points came up in discussion.  One was I wanted to post and fill this position as soon as I could.  That was my intention and I believe what I told Gloria was that this wouldn't enable her to have a substantial opportunity on the detail because I wanted to post it as soon as possible.  I didn't want to put someone there for 30 days and then potentially have a change if she wasn't a successful applicant.  The second reason, I did indicate to Gloria that I had concerns about her dependability.  I had concerns about [her] commitment and resolve to work.

Def.'s Mot. for Summ. J., Ex. 3 (Worthy Dep.) at 24:20-25:11.  It is, however, uncontested that Mr. Worthy spoke with Plaintiff on numerous occasions, both prior to and after he March 6, 2003 detail request, about his concerns regarding her dependability due to her irregular attendance and unscheduled absences.  Def.'s Stmt. ¶ 29; Pl.'s Stmt. ¶ 29; *see also* Def.'s Mot.

for Summ. J., Ex. 3 (Worthy Dep.) at 28:8-22 (noting that he tried to conduct "helpful" conversations with Plaintiff where he indicated that her frequent unscheduled absences had a significant impact because it made it difficult for him to plan and "I said if you want to go to other locations and senior managers look at your attendance it becomes challenging for that manager to make a favorable decision").  The individual ultimately awarded the EAS-21 position, Ms. Lienwand, was placed in the position effective July 7, 2003, but did not physically assume the position for over a year.  *See* Pl.'s Opp'n, Ex. 3 (Worthy Dep.) at 37-38.  Plaintiff did not file a complaint with the EEO over this event, admitting:  "I should have, but I had this going.  I didn't want to, like, beat a dead horse, you know."  Def.'s Reply, Ex. 1 (Singleton Dep.) at 119:13-16.

Ninth, and finally, Plaintiff contends that the Postal Service further retaliated against her by "accusing [P]laintiff of stealing monies, searching her desk and workplace, initiating an investigation against the plaintiff in which she is being investigated for stealing monies and placing the plaintiff on administrative leave."  First Am. Compl. ¶ 39.  Plaintiff's allegation refers to the fact that, since 2001, she had been given the petty cash responsibility by Ms. Aspengren for the purchase and safekeeping of American Express Gift Checks to be distributed as a form of recognition to various individuals in the Department or outside the office as requested by the team leaders or a manager.  Def.'s Stmt. ¶ 35; Pl.'s Stmt. ¶ 35.  During February 2004, Mr. Koukos and Ms. Pat Deshazo, the Department's budgeting coordinator, conducted an inventory on the gift checks, wherein they discovered that three (3) one-hundred dollar ($100) checks were unaccounted for and missing.  Def.'s Stmt. ¶¶ 36-37; Pl.'s Stmt. ¶¶ 36-37.

11

When questioned, Plaintiff admitted that in late 2003, she had taken and cashed three (3) one-hundred dollar ($100) American Express Traveler's Checks that she planned to use "to buy McDonald's certificates and buy some things in the postal store."  Def.'s Stmt. ¶ 38; Pl.'s Stmt. ¶ 38; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 58:14-16.  Plaintiff stated that it was her practice to give out the certificates on her own, *see* Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 56-57, and that she did so without keeping any records, *id.* at 57:22-25 ("I didn't keep a record of it.").  Plaintiff also acknowledged that, on "probably one" other occasion, "I might have used one of them [the McDonald's gift certificates] to treat myself [to purchase food].  I didn't think anything was wrong with it."  Def.'s Reply, Ex. 1 (Singleton Dep.) at 118:7-13.  According to Plaintiff, she "hadn't gotten around to buying" the three (3) gift checks that had been unaccounted for "because I had some illness in my family, and I was sick."  Def.'s Mot. for Summ. J., Ex. 1 (Singleton Dep.) at 58:13-16.  After attempting to explain herself to Mr. Koukos and Mr. Worthy, Plaintiff was placed on administrative leave with pay in March 2004 pending an investigation into the alleged misappropriation of American Express Gift Checks that were in Plaintiff's custody.  Def.'s Stmt. ¶ 39; Pl.'s Stmt. ¶¶ 39, 49.  Plaintiff contends that she was subject to "pervasive and severe working conditions" when her supervisors "blamed her for the stolen checks."  Pl.'s Opp'n at 21-22.

Based upon the facts surrounding these nine separate incidents, Plaintiff asserts -- in Counts II and III of her First Amended Complaint -- that after she filed a complaint with the EEOC office complaining of age discrimination in March 2001, the Postal Service "took a number of hostile and adverse actions against the plaintiff in retaliation for plaintiff filing the complaint with the EEOC," and "engaged in a pattern of behavior so as to create a hostile work

environment." First Am. Compl. ¶¶ 44, 46. Based upon her assertions contained within Count I

(Age Discrimination), Count II (Retaliation), and Count III (Hostile Work Environment --

Retaliation), Plaintiff requests (1) entry of judgment in her favor; (2) back pay; (3) promotion to

the position of Training Specialist, EAS-21, or, in the alternative, front pay; (4) liquidated

damages pursuant to 29 U.S.C. § 626(b); (5) attorney's fees and costs; and (6) all other

appropriate remedies to effectuate the purposes of the ADEA. *Id.* at 17-18 (Prayer for Relief).

## II: LEGAL STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment."  *Williams v.

Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead,

while the movant bears the initial responsibility of identifying those portions of the record that

demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587,

106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

    Importantly, "[w]hile summary judgment must be approached with specific caution in

discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by

affidavits or other competent evidence showing that there is a genuine issue for trial."  *Morgan v.

Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v.

Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation

omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also*

*Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate

the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is

not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the

speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting

*Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews the defendant's motion for

summary judgment under a "heightened standard" that reflects "special caution." *Aka*, 116 F.3d

at 879 (internal quotations omitted).  Nonetheless, while this special standard is more exacting, it

is not inherently preclusive.  Although more circumspect, the Court will continue to grant a

motion for summary judgment in which the nonmoving party has failed to submit evidence that

creates a genuine factual dispute and the moving party is entitled to a judgment as a matter of

law.

### III: DISCUSSION

In its Motion for Summary Judgment, the Postal Service makes two central arguments:

(1) "Defendant had legitimate, non-discriminatory reasons for not selecting Plaintiff for the

promotion at issue, and Plaintiff cannot show that Defendant failed to promote Plaintiff because

of her age"; and (2) "Plaintiff failed to exhaust her retaliation and hostile work environment

claims and, in any event, cannot establish a *prima facie* case to support either one."  Def.'s Mot.

for Summ. J. at 2.  The Court shall address each of the Postal Service's arguments in turn, first

examining Plaintiff's age discrimination claim (Count I) and then analyzing Plaintiff's retaliation

and retaliatory hostile work environment allegations (Counts II and III).

A.      *Count I -- Age Discrimination in Plaintiff's Application for the EAS-21 Position*

1.      Proper Standards

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or discharge

. . . or discriminate against any individual [who is at least forty (40) years old] . . . because of

such individual's age." 29 U.S.C. § 623(a)(1) (1994); *see id.* § 631(a).  In analyzing a

discrimination claim under the ADEA, courts are to apply the framework developed in the

context of Title VII litigation.  *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir.

1999); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997).  As such, to

prove an ADEA violation, Plaintiff must demonstrate by a preponderance of the evidence that the

actions taken by the employer were "more likely than not based on the consideration of

impermissible factors" such as race or gender.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal quotation marks and citation omitted).

Where the record contains no direct evidence of discrimination, it is necessary to employ the

*McDonnell Douglas* tripartite burden-shifting framework.  *Cones v. Shalala*, 199 F.3d 512, 516

(D.C. Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36

L.Ed.2d  668 (1973)).  It is the district court's responsibility to closely adhere to this analysis and

go no further, as it does not sit as a "super-personnel department that reexamines an entity's

business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(internal citation and quotation marks omitted).

In this case, Plaintiff argues that "[t]here is direct of evidence of discrimination present in

this case," thereby rendering the *McDonnell Douglas* framework inapplicable.  Pl.'s Opp'n at 9.

Plaintiff points to only two pieces of evidence to support her assertion:  (1) her late March 2001

conversation with Mr. Koukos regarding another employee named Jane, where Mr. Koukos allegedly remarked "When you get up to that age, also, you start having problems," Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15:2-3; and (2) her memory of Mr. Worthy, in March 2003, telling her that he would never put her in an EAS-21 Training Specialist position and that she should just retire, Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 124:18-22; *see also* Pl.'s Stmt. ¶ 41; First Am. Compl. ¶ 35 ("Mr. Worthy further informed Ms. Singleton that she wasn't committed enough, should just consider retiring and wouldn't give Plaintiff the position even if she put in for it."). According to Plaintiff, Mr. Koukos's alleged statement shows his belief "that a woman of Ms. Singleton's age started to have problems (presumably health related) and one can certainly infer from such a statement that an elderly person in his view should not be promoted." Pl.'s Opp'n at 9. Plaintiff also suggests that comment purportedly made by Mr. Worthy "go[es] a long way in establishing that the defendant had discriminatory animus towards older workers generally and the plaintiff specifically." *Id.* at 9-10.

Two problems exist with Plaintiff's assertion of direct evidence. First, the statement attributed to Mr. Koukos -- "When you get up to that age, also, you start having problems," Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15:2-3 -- occurred after Plaintiff's non-selection into the EAS-21 position and referred to another employee, not Plaintiff. As such, it is -- at best -- *indirect* evidence of discriminatory animus. Indeed, Plaintiff, by arguing that "one can certainly infer" Mr. Koukos's views from the comment, is implicitly acknowledging its indirect nature. Second, it is undisputed that Mr. Worthy did not become Plaintiff's supervisor until January 2003. Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25. Given that it is uncontested that Mr. Worthy had no role in Plaintiff's EAS-21 non-selection in March 2001 and did not supervise her work until nearly two

17

(2) years later, his alleged statements cannot be direct evidence of impermissible age

discrimination underpinning her March 2001 non-selection.  Left with no direct evidence of

discriminatory intent vis-á-vis her EAS-21 non-selection identified in Count I, Plaintiff must

"establish unlawful age discrimination by relying on the familiar burden-shifting framework first

articulated in *McDonnell Douglas*[.]"  *Hall*, 175 F.3d at 1077.

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a

preponderance of the evidence a "*prima facie*" case of discrimination. *McDonnell Douglas*, 411

U.S. at 802, 93 S.Ct. 1817.  To establish a *prima facie* case of age discrimination in violation of

the strictures of the ADEA, Plaintiff must show that:  (1) she was a member of the ADEA's

protected class of persons over forty (40) years of age; (2) she was qualified for her position and

was performing her job well enough to meet her employer's legitimate expectations; (3) she

suffered an adverse employment action despite her qualifications and performance; and (4) she

was disadvantaged in favor of similarly situated younger employees.  *See Hall*, 175 F.3d at 1077;

*Paquin*, 119 F.3d at 26 (citing *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C.

Cir. 1983)).  "The burden of establishing a prima facie case of disparate treatment is not

onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089, and because the *McDonnell Douglas* model

of the *prima facie* case is not "rigid, mechanized, or ritualistic," its requirements can vary

depending on the factual context.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct.

992, 152 L.Ed.2d 1 (2002).

If Plaintiff succeeds in meeting the four requirements for a *prima facie* case of age

discrimination, the burden shifts to Defendant to articulate some legitimate, non-discriminatory

reason for Plaintiff's non-selection, and to produce credible evidence supporting its claim.  *Id.*

18

Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").  As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881, 124 S. Ct. 325, 157 L.Ed.2d 146 (2003); *see also Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

If Defendant is successful, then "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted).  At that point, Plaintiff has the burden of persuasion to show that defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089.  Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089; *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517, 113 S.Ct. 2742)

19

("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka*, 156 F.3d at 1290 ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.   "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Id.* at 143, 120 S.Ct. 2097 (quoting *Burdine*, 450 U.S. at 255 n.10, 101 S.Ct. 1089).   The Court of Appeals has distilled this analysis, noting that the jury can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements of attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin*, 119 F.3d at 27-28.  "[T]he court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he has suffered discrimination."

*Aka*, 156 F.3d at 1290.

2.      Application of the *McDonnell Douglas* Analysis

Here, the Postal Service notes that "[f]or the purposes of this Motion, the Court can assume that Plaintiff was qualified for the EAS-21 Training Specialist position that she did not receive in 2001." Def.'s Mot. for Summ. J. at 7.  As such, the Postal Service has effectively conceded that Plaintiff meets the *prima facie* case for establishing age discrimination.  An independent review of the evidence before the Court supports this concession:  (1) Plaintiff was fifty-five (55) years old in March 2001, the time of her non-selection to the EAS-21 Training Specialist position, Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10; (2) the Postal Service admits, for the purposes of the Court's consideration of its summary judgment motion, that Plaintiff was qualified for the position, Def.'s Mot. for Summ. J. at 7; (3) Plaintiff was not selected for the promotion, and this denial is sufficient to constitute an adverse employment action, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); and (4) the individual chosen for the position, Ms. Ghu, was thirty-four (34) years old at the time of the selection, making her younger than Plaintiff, Def.'s Stmt. ¶ 11; Pl's Stmt. ¶ 11.  The burden now shifts under the *McDonnell Douglas* analysis to the Postal Service to provide some legitimate, non-discriminatory reason for Plaintiff's non-selection, and to produce credible evidence supporting its claim.

The Postal Service has adduced two legitimate, non-discriminatory reasons for choosing Ms. Ghu over Plaintiff for the EAS-21 Training Specialist position.  First, the Postal Service has

introduced substantial evidence indicating that the selecting officer, Mr. Koukos, believed that

Ms. Ghu was more qualified to handle the position than Plaintiff.  Def.'s Stmt. ¶ 13; Def.'s Mot.

for Summ. J., Ex. 1 (Koukos Dep.) at 33.  In contrast to Plaintiff, who did not have a college

degree, Ms. Ghu possessed a B.A. in finance, and was considered by Mr. Koukos to be "just a

brighter individual" with better "[o]verall work experience and background."  Def.'s Stmt. ¶ 13;

Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 70-71.  While at the time of her application,

Plaintiff was in the midst of a short, two-month long temporary detail in the EAS-21 position,

Mr. Koukos emphasized that Plaintiff was not involved in the preparation of budgets or decision-

making responsibilities -- two key responsibilities in the position.  Def.'s Stmt. ¶ 14; Def.'s Mot.

for Summ. J., Ex. 1 (Koukos Dep.) at 14-21, Ex. 2 (Singleton Dep.) at 61-63, 67.  Because he felt

that Ms. Ghu possessed a better background in these areas, was brighter, and had more training,

Mr. Koukos favored Ms. Ghu in his recommendation.  *Id.*

Second, the Postal Service introduced a significant amount of evidence highlighting the

fact that Plaintiff had significant attendance problems during her time in the Department --

problems that factored into her non-selection.  Def.'s Stmt. ¶ 17; Pl.'s Stmt. ¶ 17; Def.'s Mot. for

Summ. J., Ex. 1 (Koukos Dep.) at 48:2-14.  During her long commute from Baltimore,

Maryland, Plaintiff was often two to two and half hours late for work, and continued to arrive

tardy even after the Postal Service pushed back her start time in order to accommodate her needs.

Def.'s Stmt. ¶¶ 18-19; Pl.'s Stmt. ¶¶ 18-19.  Indeed, Plaintiff was late "a couple of times a

month, at least" by her own admission, and "once or twice every week" according to her co-

workers, despite frequent conversations with her supervisors regarding her poor attendance.

Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 7; Def.'s

Mot. for Summ. J., Ex. 1 (Koukos Dep.) at 61:7-62:3; Def.'s Mot. for Summ. J., Ex 5 (Decls. of

Messrs. James French and Charles Johnson) at ¶ 3, 1.  Ms. Ghu, on the other hand, had a

reputation for arriving for work on time everyday despite her lengthy commute from Richmond,

Virginia.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.

Given these two credible, legitimately non-discriminatory factors identified by the Postal

Service, Plaintiff now must seize the "opportunity to discredit the employer's explanation," *Aka*,

156 F.3d at 1288, by demonstrating that the proffered reasons are a mere pretext for

discrimination, *see Paquin*, 119 F.3d at 26-27.  As always, Plaintiff retains the "ultimate burden

of persuading the court that she has been the victim of intentional discrimination."  *Burdine*, 450

U.S. at 256, 101 S.Ct. 1089.  At this point,

> a court reviewing summary judgment looks to whether a reasonable jury could
> infer intentional discrimination or retaliation from all the evidence, including (1)
> the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the
> employer's proffered explanation for its action; and (3) any further evidence of
> discrimination that may be available to the plaintiff (such as independent evidence
> of discriminatory statements or attitudes on the part of the employer).

*Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (internal citations and

quotation marks omitted).  In attempting to show that the Postal Service's articulated reasons for

her non-selection are pretextual, Plaintiff candidly admits that she did not hear anyone in the

Department's management indicate that they wanted someone younger than her for the

permanent EAS-21 position.  Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 16; Def.'s Mot. for Summ. J., Ex. 2

(Singleton Dep.) at 87.  However, Plaintiff seeks to undermine each of the Postal Service's

proffered justifications.

<u>First</u>, she attempts to undermine Ms. Ghu's qualifications by stressing that she "had experience in training, employee development, and curriculum longer than Ms. Ghu had been with the [P]ostal [S]ervice," she "had been detailed into this very same position prior to not being selected for the permanent position," and "[a]fter Ms. Ghu was placed in the position, she constantly sought help from the plaintiff and she was told by Mr. Koukos to help her."  Pl.'s Stmt. ¶ 14.  Two central problems belie Plaintiff's assertions of superior qualifications.  First, contrary to Plaintiff's overinflated claims, the evidence clearly shows that Plaintiff was essentially a secretary seeking to become a training specialist.  Plaintiff never developed training materials herself, even when she was temporarily assigned to a Training Specialist function.  *See* Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 76 (Plaintiff admits this failure, and while she maintained that she "was helping to develop them by revising some work," she concedes that her help amounted to secretarial work -- typing "[s]omeone else's edits").  While Plaintiff stresses that she had four years of experience in the Employment Development Department, this experience was as a level EAS-9 secretary "handling administrative duties and assisting team leaders in the department."  Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.  Second, assuming the truth of Plaintiff's vague, generalized assertion that Ms. Ghu sought some type of assistance from her, the simple fact that Ms. Ghu sought help from Plaintiff is not indicative of her inferior qualifications.  Rather, coming from an outside department, it is certainly logical that Ms. Ghu would turn to the individual who had just finished a temporary two-month assignment in the position.  Moreover, Plaintiff does not indicate the nature of the request for assistance -- whether logistical, substantive, or otherwise.  Indeed, Plaintiff does not contest Ms. Ghu's superior educational background.

Second, in addition to her attempt to undermine Ms. Ghu's qualifications, Plaintiff

contends that criticisms about her attendance are not supported by the record.  First, Plaintiff

asserts that Plaintiff's attendance records for the time period that she was temporarily detailed to

the EAS-21 position -- January 2001 through early March 2001 -- show that she was not at work

for only three (3) days, and that each of these absences had been pre-approved by Mr. Koukos.

Def.'s Opp'n at 13 (citing Def.'s Opp'n, Ex. 2 (Koukos Dep.) at 49-53).  However, the evidence

cited to by Plaintiff is only of limited value; it shows only that she was entirely absent for three

(3) days during a two-month span, but it does not reveal either (1) how many times she was fully

absent over the entire course of her employment with the Department, or (2) how many times she

was late for work during either that two-month span or her entire tenure.  Indeed, tardiness rather

than absenteeism appears to have been the major complaint against Plaintiff by her superiors.

*See* Pl.'s Opp'n, Ex. 2 (Koukos Dep.) at 56:5-10 (indicating that "the problem with her

attendance during this specific period was not so much that [Plaintiff] was out all day but that she

arrived at work late").  Second, Plaintiff contends that, prior to her interview with Mr. Koukos

for the EAS-21 position, "Koukos never had discussions with the plaintiff about her attendance."

Pl.'s Opp'n at 13 (citing Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 69:13-19 (Plaintiff states that she

was called into Mr. Koukos's office in March 2001 after her non-selection and was told "[h]e

would have given me the job, but he didn't give it to me because of my attendance . . . that's the

first time he mentioned my attendance").  Plaintiff's only evidence supporting this claim is her

own unsubstantiated deposition testimony, which is quite equivocal on the matter.  *See* Pl.'s

Opp'n, Ex. 1 (Singleton Dep.) at 69:21-22 (when asked, "The first time he ever mentioned your

attendance," Plaintiff answered, "With *this* job," making it unclear whether she was referring to

25

only her limited two-month temporary detail in the EAS-21 position or her entire tenure in the

Department) (emphasis added).  In contrast, Plaintiff's unsupported claim is contradicted by the

memories of three other individuals.  *See* Pl.'s Opp'n, Ex. 2 (Koukos Dep.) at 48:2-6; Def.'s

Mot. for Summ. J., Ex. 1 (Koukos Dep.) at 61:7-62:3 (noting that he discussed orally Plaintiff's

tardiness problems with her "[e]very week, a couple of times a week" for "[a] good part of the

detail"); Def.'s Mot. for Summ. J. Ex 5 (Decls. of Messrs. James French and Charles Johnson) at

¶ 3, 1 (noting that "[f]rom January 2001 through March 2003," Plaintiff's "supervisors had

several conversations with her regarding her poor attendance").  Even accepting Plaintiff's

version of the conversations regarding her tardiness, the fact that Plaintiff admits that Mr.

Koukos discussed her attendance problems during the initial conversation with Plaintiff

regarding her non-selection -- prior to any EEO complaint filed by Plaintiff -- supports an

inference that Mr. Koukos's citation to "attendance issues" is not pretextual.

Upon a review, the Court concludes that a reasonable fact-finder could not conclude that

the Postal Service's two articulated, non-discriminatory reasons behind its non-selection of

Plaintiff are pretextual.  Rather, Plaintiff's claim of non-selection due to age discrimination is

legally without merit.  Importantly, a "[p]laintiff cannot establish pretext simply based on her

own subjective assessment of her own performance, for plaintiff's perception of herself, and of

her work performance, is not relevant.  It is the perception of the decisionmaker which is

relevant." *Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal citation

and quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C. Cir. 2002).  Indeed, the issue in a non-

selection case is not the correctness of the decision-maker's reasons, but rather whether he or she

honestly believes them.  *See Fischbach*, 86 F.3d at 1182 (citing cases).  While Defendant has

never contested that Plaintiff was qualified in the abstract to EAS-21 position, *see* Def.'s Mot. for

Summ. J. at 7, Plaintiff has not presented sufficient evidence or argument to undermine the

Postal Service's claims that "superior education and intellect" and "attendance issues" were at

the heart of Plaintiff's non-selection.  Indeed, Plaintiff has presented virtually no evidence

outside of her own self-serving statements and speculation, and such a paucity of evidence is

insufficient to establish pretext.  *See, e.g.*, *Hastie v. Potter*, Civ. No. 00-5423, 2001 WL 793715,

at *1 (D.D.C. June 28, 2001) (finding no genuine issue of material fact where the sole evidence

plaintiff provided was "her own self-serving and conclusory statement"); *Saunders v. DiMario*,

Civ. No. 97-1002, 1998 WL 525798, at *4 (D.D.C. Aug. 14, 1998) ("Plaintiff has otherwise

offered the type of self-serving allegations that are simply insufficient to establish pretext.").

Moreover, the D.C. Circuit has explained that discrimination will not be inferred absent a

showing that plaintiff's qualifications were *far superior* to the successful candidate's.  *Aka*, 157

F.3d at 1296 (emphasis added).

> If a factfinder can conclude that a reasonable employer would have found the
> plaintiff to be *significantly better qualified* for the job, but this employer did not,
> the factfinder can legitimately infer that the employer consciously selected a less-
> qualified candidate--something that employers do not usually do, unless some
> other strong consideration, such as discrimination, enters into the picture.

*Id.* at 1294 (emphasis added); *see also Horvath v. Thompson*, 329 F. Supp. 2d 1, 7 (D.D.C. 2004)

(the plaintiff's qualifications must be "*far superior* to the successful candidates's"); *Tolson v.*

*James*, 315 F. Supp. 2d 110, 116 (D.D.C. 2004) (same); *cf. Edwards v. Principi*, Civ. 80 Fed.

Appx. 950, 952 (5th Cir. 2003) (to show pretext, "a plaintiff [must] show a difference in his

qualifications superior to that of the person selected so apparent as to virtually jump off the page

and slap us in the face").  In *Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003), the D.C. Circuit

reinforced the maxim that "fine distinctions" between applicants were not sufficient to raise a

jury question. *Id.* at 430.

> [Plaintiff]'s pointing to differences in qualifications that mere indicate a 'close
> call' does not get him beyond summary judgment.  This Court will not reexamine
> governmental promotion decisions where it appears the Government was faced
> with a difficult decision between two qualified candidates, particularly where
> there is no other evidence that [age] played a part in the decision.

*Id.*

Here, Plaintiff has not presented evidence indicating that she was a "far superior

candidate" for the EAS-21 Training Specialist when compared with Ms. Ghu.  Ms. Ghu was a

college-educated employee with a degree in finance who had worked for the Postal Service for

roughly four years and had a track record of dependable attendance.  Plaintiff, while a longtime

employee of the Postal Service, was not college-educated and had basically performed as a

secretary handling administrative matters; her only advantage over Ms. Ghu was her two-month-

long temporary detail to the position, where she drafted no new training materials and handled no

budgetary matters.  At most, Plaintiff's challenge amounts to nothing but her subjective

"quibbling about qualifications" that this Court has rejected on a consistent basis.  *See, e.g.*,

*Buggs v. Powell*, 293 F. Supp. 2d 135, 144 (D.D.C. 2003); *Choates v. Powell*, 265 F. Supp. 2d

81, 95 (D.D.C. 2003); *Vasilvesky v. Reno*, 31 F. Supp. 2d 143, 150 (D.D.C. 1998).  As such,

summary judgment in favor of the Postal Service on Count I of Plaintiff's First Amended

Complaint is appropriate.

     B.     *Counts II and III -- Retaliation and Retaliatory Hostile Work Environment*

Count II and III of Plaintiff's First Amended Complaint allege that after Plaintiff filed a

charge of age discrimination against the Postal Service with EEO Compliance and Appeals on

March 12, 2001, First Am. Compl. ¶ 11, the Postal Service subjected Plaintiff to both repeated

retaliation and a retaliatory hostile work environment -- as evident in nine separate incidents. *See*

*supra* Section II(B) (listing the nine examples cited to by Plaintiff).  Two important

considerations doom Counts II and III of Plaintiff's First Amended Complaint, and necessitate

summary judgment in favor of the Postal Service:  (1) Plaintiff failed to exhaust her

administrative remedies regarding these claims, as required; and (2) Plaintiff cannot establish a

*prima facie* case of either retaliation or a retaliatory hostile work environment.

      1.    <u>Failure to Exhaust</u>

    Importantly, the EEOC "has established detailed procedures for the administrative

resolution of discrimination complaints, including a series of time limits for seeking informal

adjustment of complaints, filing formal charges, and appealing agency decisions to the

Commission." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  Counts II and III

of Plaintiff's First Amended Complaint merit dismissal because Plaintiff has failed to comply

with two separate exhaustion requirements, and has failed to pursue the proper administrative

remedies to her claims of retaliation and hostile work environment.  First, before filing suit under

the ADEA, a putative plaintiff must exhaust her administrative remedies by filing a charge of

discrimination with the EEOC within 180 days of the alleged discriminatory incident.  29 U.S.C.

§ 626(d)(1); *see also Washington v. Washington Metro Area Transit Auth.*, 160 F.3d 750, 752

(D.C. Cir. 1998) (stating that "[b]efore suing under the ADEA[,] . . . an aggrieved party must

exhaust his administrative remedies by filing a charge of discrimination with the EEOC").  The

"charge" requirement mandates the filing of a written statement identifying the potential

defendant and generally describing the alleged discriminatory incident.  H.R.Rep. No. 95-950, at

12 (1978). The need for a timely, clear charge to be filed with the EEOC is essential, as the D.C.

Circuit has emphasized: "Allowing a complaint to encompass allegations outside the ambit of

the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as

well as deprive the charged party of notice of the charge, as surely as would an initial failure to

file a timely EEOC charge." *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir.

1997).

Second, under 29 C.F.R. § 1614.105, "aggrieved" employees or applicants for

employment who allege that they have been discriminated against must first consult an agency

EEO counselor before filing a complaint of discrimination and must do so within forty-five (45)

days of the "matter alleged to be discriminatory or, in the case of a personnel action, within 45

days of the effective date of the action." *Prior v. Potter*, 296 F. Supp. 2d 1031, 1035 (E.D.Mo.

2003) (citing 29 C.F.R. § 1614.105 in the context of the ADEA).

Compliance with these procedures and time limits is mandatory. "Complainants must

timely exhaust these administrative remedies before bringing their claims to court." *Bowden v.

United States*, 106 F.3d 433, 437 (D.C. Cir. 1997); *Bayer v. Dep't of Treasury*, 956 F.2d 330,

332 (D.C. Cir. 1992); *Williams v. Munoz*, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely

administrative charge is a prerequisite to initiation of a Title VII action"). "Because untimely

exhaustion of administrative remedies is an affirmative defense, the defendant bears the

responsibility of pleading and proving it." *Id.* at 437 (citing *Brown v. Marsh*, 777 F.2d 8, 13

(D.C. Cir. 1985)); *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96, 111 S.Ct. 453,

112 L.Ed.2d 435 (1990). Importantly, the administrative deadlines imposed by this scheme are

not jurisdictional in nature: "they function like a statute of limitations and like a statute of

30

limitations, are subject to waiver, estoppel, and equitable tolling." *Marsh*, 777 F.2d at 14

(citations omitted). Nevertheless, it is clear that dismissal results when a plaintiff fails to exhaust

administrative remedies. *See Rann v. Chao*, 346 F.3d 192, 194-95 (D.C. Cir. 2003) (affirming

the trial court's dismissal of the plaintiff's ADEA claim for failure to exhaust administrative

remedies); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 17-18 (D.D.C. 2004) (dismissing

ADEA claim for failure to exhaust).

In this case, despite knowledge of her administrative exhaustion requirements and despite

the fact that she had previously met those requirements (in her March 2001 non-selection

complaint), Plaintiff admittedly failed to seek EEO counseling for *any* of the conduct that she

alleges constituted either (1) an adverse action relating to her prior EEO complaint (for the

March 2001 EAS-21 non-selection) (Count II), or (2) a hostile work environment related either to

her prior EEO complaint or to her age (Count III). *See* Def.'s Reply, Ex. 1 (Singleton Dep.) at

119:13-16 ("I should have, but I had this going. I didn't want to, like, beat a dead horse, you

know."); *accord Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-118, 122 S.Ct. 2061,

153 L.Ed.2d 106 (2002) (setting out different limitations rules for discrete acts such as retaliation

and hostile work environment claims). In attempting to escape this failing, Plaintiff cites to

equitable considerations, and asserts that "[p]laintiffs are not even required to file administrative

charges with an EEO office, as noted by several cases." Pl.'s Opp'n at 25 (citing *Morgan v.

Washington Mfg. Co.*, 660 F.2d 710, 712 (6th Cir. 1981); *Equal Employment Opportunity

Comm'n v. Delaware Trust Co.*, 416 F. Supp. 1040, 1044-46 (D.Del. 1976)). Upon a review,

Plaintiff's citations to *Morgan* and *Delaware Trust Co.* are plainly inapposite. In *Morgan*, the

plaintiff incorrectly submitted a sex discrimination complaint to the Wage and Hour Division of

the Federal Department of Labor; the Wage and Hour Division received the charge of

discrimination within the 180 day period, as required, and then forwarded the charge to the

EEOC, who then received the charge after the time limit expired. *Morgan*, 660 F.2d at 711. The

Sixth Circuit found reason to equitably toll the limitations period given the plaintiff's good faith

effort and harmless error. *Id.* at 712. The plaintiff in *Delaware Trust Co.* made a similar error,

filing a timely complaint with the Office of Federal Contract Compliance but not the EEOC.

*Delaware Trust Co.*, 416 F. Supp. at 1044-46. The court made alternative findings, indicating

that this filing was sufficient to act as a "constructive" EEOC receipt of the complaint and also

noting that the incorrect filing tolled the statute of limitations until the plaintiff correctly filed

with the EEOC. *Id.* In this case, unlike *Morgan* and *Delaware Trust Co.*, Plaintiff did not make

a timely filing to an incorrect federal office or agency; rather, Plaintiff simply neglected to make

any filing at all. As such, unlike those plaintiffs, Plaintiff has shown no good faith effort on her

part and has presented no equitable considerations to excuse her noncompliance.

Given Plaintiff's acknowledged failures to meet her administrative exhaustion

requirements and the complete absence of any equitable considerations in her favor, the Court

concludes that Counts II and III of Plaintiff's First Amended Complaint merit dismissal under 29

C.F.R. § 1614.105 and 29 C.F.R. § 1614.201. Plaintiff has both failed to file any EEO

complaints, let alone any timely complaints, and has also failed to seek counseling, as required.

As such, summary judgment is appropriate.

> 2.   Failure to Establish a *Prima Facie* Case of Retaliation and Hostile Work
>       Environment

In her Complaint and Opposition, Plaintiff cites to nine (9) separate incidents that

allegedly reflect both retaliation and an effort to create a hostile work environment by the Postal Service in response to Plaintiff's filing of an EEO complaint regarding her non-selection to the EAS-21 position in March 2001. *See supra* Section II(B). These nine (9) alleged events asserted to have been discriminatory include: (1) Plaintiff's post-March 2001 increase in workload; (2) Mr. Koukos's statement, "When you get up to that age, also, you start having problems," referring to an employee named Jane when speaking with Plaintiff; (3) the $50 reduction in Plaintiff's spot bonus; (4) the notations made by Plaintiff's supervisors regarding her arrival times; (5) the November 2001 non-selection of Plaintiff to an EAS-11 secretarial position vacated by Ms. Seay; (6) Mr. Worthy's order that Plaintiff prepare cubicles for the arrival of three new employees; (7) Mr. Worthy's requirement that Plaintiff provide a doctor's note for three (3) days missed due to bursitis; (8) the March 2003 denial of Plaintiff's request for a temporary detail to an EAS-21 Training Specialist position; and (9) the investigation and suspension of Plaintiff revolving around the purported theft of $300 in American Express Traveler's Checks. *Id.* Even assuming *arguendo* that Plaintiff had appropriately exhausted her administrative remedies for her claims under Counts II and III, these claims would still merit summary judgment, as Plaintiff has failed to establish a *prima facie* case of retaliation and a retaliatory hostile work environment.

        i.     *Retaliation*

To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in statutorily protected activity; (2) the Postal Service took an adverse personnel action; and (3) that a causal connection existed between the two. *See Jones v. Washington Metro Area Transit Auth.*, 205 F.3d 428, 433 (D.C. Cir. 2000); *Morgan*, 328 F.3d at 651; *Holbrook v. Reno*, 196 F.3d 255,

263 (D.C. Cir. 1999).

To establish an adverse employment action in the absence of a diminution in pay or benefits, Plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of employment." *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). The employment decision must inflict "objectively tangible harm." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (recognizing that this requirement "guards against both judicial micromanagement of business practices, and frivolous suits over insignificant slights") (internal quotation omitted). "An employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002); *see also Russell*, 257 F.3d at 818 ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a discrimination suit.") (citations and internal quotation omitted); *Brody*, 199 F.3d at 457 ("Mere idiosyncrasies of personal preference are not sufficient to create an injury."). As noted previously, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. 2257. However, an employer's criticism of an employee's work does not generate a tangible employment action. *See, e.g.*, *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 17 (D.D.C. 2000) ("Formal criticism and poor performance evaluations do not ordinarily constitute adverse actions."); *Brodetski v. Duffey*, 141 F. Supp. 2d 35, 43 (D.D.C. 2001) ("Criticism of an

employee's performance unaccompanied by a change in position or status does not constitute adverse employment action.").

To prove a causal connection, Plaintiff must make a "showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985); *see also Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) ("[C]ourts have recognized that proof of causal connection can be established indirectly by showing that discriminatory activity is followed by discriminatory treatment."). Importantly, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima face case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Courts have generally accepted time periods of a few days up to a few months, and have seldom accepted time lapses outside of a year in length. *See Brodetski*, 141 F. Supp. 2d at 43. The District Court for the District of Columbia has held that a matter of weeks, and of three to five months is a short enough time lapse between the protected activity and the alleged retaliatory conduct to establish a causal connection. *See, e.g.*, *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 3-4 (D.D.C. 1989) (holding that five weeks constituted a short enough time lapse to establish a causal connection); *Castle v. Bentsen*, 867 F. Supp. 1, 3 (D.D.C. 1994) (holding that three to five months is a short enough time lapse between EEO activity and reprisal to establish a causal connection), *aff'd*, 78 F.3d 654 (D.C. Cir. 1996). However, courts within this Circuit have also found that time lapses of greater length negate any inference that a causal connection exists between the protected activity and the complained-of action. *See, e.g.*, *MECO*

*Corp. v. Nat'l Labor Relations Bd.*, 986 F.2d 1434, 1437 (D.C. Cir. 1993) (citing various cases

noting that gaps of four-to-eight months were insufficient to support an inference of causation in

a similar setting); *Devera v. Adams*, 874 F. Supp. 17, 21 (D.D.C. 1995) (holding that "an eight

month interval between the two events is not strongly suggestive of a causal link"), *aff'd*, 1997

WL 404898 (D.C. Cir. June 5, 1997); *Garrett v. Lujan*, 799 F. Supp. 198, 202 (D.D.C. 1992)

(holding that almost a year "between plaintiff's EEO activity and the adverse employment

decision is too great [a length of time] to support an inference of reprisal"); *Townsend v.

Washington Metro Airport Auth.*, 746 F. Supp. 178, 187 (D.D.C. 1990) (two year gap insufficient

to create inference); *Forman v. Small*, 271 F.3d 285, 301 (D.C. Cir. 2001) (three year lapse

insufficient to support inference of causation).  Accordingly, the greater the time that has elapsed

between the protected activity and the alleged acts of discrimination, the more difficult it is for a

complainant to justify an inference of causal connection between the two.  *See Saunders*, 1998

WL 525798, at *5.

Plaintiff is unable to establish a *prima facie* case of retaliation for any of her nine (9) cited

instances because each of the examples is either insufficient to constitute an adverse personnel

action and/or lacks a causal connection with her March 2001 EEO complaint.  The Court shall

review each cited event in order to highlight the flaws within Plaintiff's retaliation claim.

Increased Workload:  Plaintiff alleges that after her March 2001 EEO complaint, her

immediate supervisors -- Ms. Aspengren and Mr. Worthy -- increased her workload "in

comparison to other employees in comparable positions" to such an extent that she often had to

eat her lunch at her desk in order to meet the workload demands.  First Am. Compl. ¶¶ 29-30, 32;

Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 89:16-23.  However, several factors exist to undermine

Plaintiff's assertion, and thwart Plaintiff's effort to establish that she underwent an adverse

employment action.  First, Plaintiff admits that she was able to complete all of the work assigned

to her during her regular work hours, and was not required to work hours beyond those required

of a typical employee.  Def.'s Stmt. ¶¶ 23, 34; Pl.'s Stmt. ¶¶ 23, 34; Pl.'s Opp'n, Ex. 1 (Singleton

Dep.) at 101-02.  Second, Plaintiff admits that she did not know the extent of the duties,

responsibilities, and workload of her sole counterpart in the Department, Ms. Seay, because Ms.

Seay "sat at the other side of the office" and Plaintiff "couldn't see her, physically see her."

Def.'s Stmt. ¶ 23; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 89:9-15.  Third, as Plaintiff indicated,

her apparent workload increase corresponded with Mr. Stefl's decision to let go of his secretary,

a decision that Mr. Stefl made because "they were having a reduction in force and he volunteered

to get rid of his secretary."  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 16:5-9, 16:14-17 (noting that

this meant that Plaintiff then "had to get his mail, and do his travel, and answer his telephone,

take all his messages, and the whole nine yards").  Given the evidence presented before the

Court, it is clear that Plaintiff cannot establish a *prima facie* case of retaliation due to workload

increase because (1) she cannot show an "adverse action" because she has no proof that her

workload actually increased in any substantially greater proportion than any of her counterpart's

workload, and she did not have to work overtime to accomplish her assigned duties; and (2) by

Plaintiff's own admission, her apparent workload increased in connection with Mr. Stefl's

decision to let go of his secretary due to the need for a reduction in force, ensuring that Plaintiff

cannot establish the requisite causal connection to her EEO complaint.

     Mr. Koukos's Comments Regarding Jane:  Plaintiff maintains that Mr. Koukos's

comments to her regarding another employee Jane, during a conversation in March 2001, were

evidence of retaliation against her.  Pl.'s Stmt. ¶ 40; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15-16.

In the conversation, Mr. Koukos allegedly remarked, when speaking of Jane, "When you get up

to that age, also, you start having problems."  Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 15:2-3.

Plaintiff fails to establish a *prima facie* case of retaliation in this instance for three reasons:  (1)

Mr. Koukos's remark was admittedly not about Plaintiff, but was regarding a third-party,

meaning that Plaintiff was no adversely affected in any way; (2) Mr. Koukos's alleged comment,

even if characterized as a criticism of another employee, is insufficient to constitute an adverse

action, *see Weigert*, 120 F. Supp. 2d at 17; *Brodetski*, 141 F. Supp. 2d at 47; and (3) Plaintiff can

establish no causal link between this comment and retaliatory motivations stemming from her

EEO complaint, other than an unsubstantiated suspicion that Mr. Koukos was actually referring

to her age.

      <u>Diminution in Spot Bonus</u>:  Plaintiff next contends that, when conversing with Mr. Dale

Ellis, she learned that Ms. Aspengren involved herself with Mr. Ellis's planned $100 spot bonus

to Plaintiff in September 2001, and "wound up saying, "Just give her $50."'"  Pl.'s Opp'n, Ex. 1

(Singleton Dep.) at 19:7-8; First Am. Compl. ¶ 31.  Plaintiff's efforts to establish a *prima facie*

case of retaliation vis-á-vis this instance fail for three reasons.  First, Plaintiff provides no

competent evidence to support this claim.  Plaintiff's deposition testimony refers to a statement

made by Mr. Ellis regarding a comment made by Ms. Aspengren; such testimony is certainly

double hearsay.  As a general rule, Plaintiff's "evidence" is legally insufficient to support her

allegation.  *See Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C.

Cir. 2000) (hearsay evidence is insufficient to defeat summary judgment, as "[v]erdicts cannot

rest on inadmissible evidence"); *Commercial Drapery Contractors, Inc. v. United States*, 133

F.3d 1, 6 (D.C. Cir. 1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment."); 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722, at 371-72 (3d ed. 1998) ("Only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion, however.").  Second, the entitlement to a "spot bonus" is not a condition of Plaintiff's employment.  Accordingly, the receipt of an amount less than she had hoped to receive does not constitute a material employment change, i.e., an adverse employment action.  Third, Plaintiff presents no evidence indicating a causal connection between Ms. Aspengren's alleged reduction of her spot bonus and Plaintiff's March 2001 EEO complaint; moreover, given that roughly six (6) months had passed between that filing and Ms. Aspengren's asserted intervention, Plaintiff's contention is on the borderline of a plausible inference of causation.  However, given the other weaknesses mentioned, Plaintiff's claim clearly fails.

Calendar Notations and Time Scrutiny:  Plaintiff claims that in retaliation for her March 2001 EEO complaint, she subsequently faced heightened scrutiny of her attendance at work. Pl.'s Stmt. ¶ 45.  In support of this contention, Plaintiff points to the fact that Ms. Aspengren made notations of both her arrival times and when she got out of her seat in a calendar kept in her office, id., Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 22:2-14, and Mr. Koukos made it part of his routine to observe another employee inputting of Plaintiff's time and attendance in the Department's records, id.; Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 48:4-10.  Plaintiff's assertion of retaliation in this case once again fails to meet the standards necessary for the establishment of a *prima facie* case.  Importantly, the alleged actions by Ms. Aspengren and Mr. Koukos do not constitute "a tangible change in the duties or working conditions constituting a *material*

employment *disadvantage*."  *Stewart*, 275 F.3d at 1134.  Rather, the extra care and scrutiny placed by Plaintiff's on her attendance had no material effect on Plaintiff's duties, salary, or working conditions.  While Plaintiff might have been unhappy with such attention, Plaintiff's displeasure with minor office management decisions is not the type of significant "disadvantage" necessary to constitute an adverse employment action.  *See Russell*, 257 F.3d at 818; *Burlington Indus.*, 524 U.S. at 761, 118 S.Ct. 2257.

    <u>Failure to Be Placed in EAS-11 Secretarial Position in November 2001</u>:  Despite her assumed application to the position, Plaintiff was not selected for an open EAS-11 secretarial position in November 2001 -- a decision made, according to Plaintiff, "just for reprisal."  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 40:18-19.  In an attempt to overcome her failure to bring any form of administrative complaint regarding her non-placement into the EAS-11 secretarial position made vacant by Ms. Seay's departure in November 2001, Plaintiff endeavors to mask what really is a non-selection claim into a retaliation claim.  Despite Plaintiff's efforts, her retaliation claim surrounding her denial of the EAS-11 post fails for two major reasons.  First, Plaintiff has proffered no evidence to indicate that she actually applied for the position.  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 40:1-5 (Plaintiff admits that she cannot recall being interviewed for the position).  Second, Plaintiff is unable to establish the requisite causation for a *prima facie* case of retaliation.  Plaintiff presents no direct evidence behind her theory that she was not placed in the position due to retaliatory animus; rather, all evidence indicates that another individual, Ms. Nash, was placed into Ms. Seay's old position because Ms. Nash's previous position had been subjected to a "reduction in force."  Def.'s Mot. for Summ. J., Ex. 2

(Singleton Dep.) at 40:16-41:7.  Indeed, it is uncontested that this decision allowed the Postal

Service to retain Ms. Nash as an employee.  *Id.*  Plaintiff's theory instead rests solely upon her

assertion that, "I feel they did that just for reprisal."  Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Def.'s

Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 40:18-19.  Plaintiff's unsupported suspicion is

simply insufficient to establish causation, especially given the fact that Ms. Nash was actually

placed into the position over nine (9) months after Plaintiff's March 2001 EEO complaint -- a

time period well over the typical limits for an inference of causation.

Order to Clean Out Cubicles:  Plaintiff next alleges that after Mr. Worthy became her

supervisor in January 2003, he ordered her to "clean out" certain cubicles in order to pave the

way for the arrival of various new employees in the Department.  Pl.'s Stmt. ¶ 48; Pl.'s Opp'n,

Ex. 1 (Singleton Dep.) at 133:23-134:4.  Once again, there are two flaws that doom Plaintiff's

effort to establish a *prima facie* case of retaliation.  First, Mr. Worthy's request that the

Department's secretary, i.e., Plaintiff, prepare a desk for a new arrival by discarding certain

materials and preserving other such materials simply does not rise to the level of an "adverse

employment action" encompassed by employment discrimination laws.  Mr. Worthy's requests

involved duties that were of a limited duration, located in Plaintiff's office environment, and

required Plaintiff's familiarity with the importance of certain Department materials.  While the

assignment might well have been an irritant, it did not produce a significant change in Plaintiff's

employment status.  Second, these "cleaning" assignments occurred roughly two (2) years after

Plaintiff filed her March 2001 EEO complaint.  Plaintiff has presented no direct evidence

connecting that filing with her "cleaning" assignments, and Mr. Worthy did not become

Plaintiff's supervisor until January 2003 -- over eighteen (18) months after Plaintiff's EEO filing;

41

indeed, it is uncontested that Mr. Worthy did not become aware of Plaintiff's March 2001 EEO complaint until November or December 2003.  Def.'s Stmt. ¶ 25; Pl.'s Stmt. ¶ 25.  Given the length of time between Plaintiff's filing and these "cleaning" assignments, and Mr. Worthy's lack of connection to the March 2001 complaint, there can be no inference of causation.  As such, Plaintiff is unable to establish a *prima facie* case of retaliation in this instance.

Requirement of a Doctor's Note:  Plaintiff also asserts that retaliatory motivations were behind Mr. Worthy's requirement that Plaintiff bring in a doctor's note after she had missed three (3) days due to a bursitis condition in her leg.  Pl.'s Stmt. ¶ 47.  Plaintiff claims that Mr. Worthy did not enforce this requirement for "any other employees in the [D]epartment."  *Id.*  Plaintiff's contention fails to meet two of three criteria necessary to establish a *prima facie* case of retaliation.  First, the requirement of a doctor's note did not affect a material employment disadvantage upon Plaintiff.  Plaintiff suffered no diminution in salary, benefits, duties, or working conditions; rather, she was simply subject to a minor irritant.  Second, Plaintiff cannot establish the requisite causation.  She presents no direct evidence linking this claim to her March 2001 EEO complaint, and, given the fact that roughly two years had elapsed between that complaint and Mr. Worthy's decision to require a doctor's note, no inference of causation is proper.

March 2003 Denial of a Temporary EAS-21 Detail to Plaintiff:  Plaintiff further claims that retaliation motivations on the part of Mr. Worthy led to the denial of her March 2003 request for a temporary assignment appointment to an EAS-21 Training Specialist position that had recently been vacated.  First Am. Compl. ¶ 33.  According to Plaintiff, Mr. Worthy provided two central reasons why he had chosen to deny her the relevant detail:  (1) "he was going to fill [the

42

position] fairly quickly" and had no need for a temporary detail, Pl.'s Opp'n, Ex. 1 (Singleton

Dep.) at 124:18-22; and (2) given Plaintiff's irregular attendance and unscheduled absences, he

"further informed Ms. Singleton that she wasn't committed enough," First Am. Compl. ¶ 35.

However, Plaintiff also notes that Mr. Worthy told her that she "should just retire" and that "he

wouldn't give [her] a[n] [EAS-21] job anyway." Pl.'s Opp'n, Ex. 1 (Singleton Dep.) at 124:18-

22; First Am. Compl. ¶ 35. Plaintiff fails to establish a *prima facie* case for retaliation in regards

to this claim for two reasons. First, a temporary or "lateral transfer or the denial thereof, *without*

*more*, does not constitute an adverse employment action." *Stewart*, 275 F.3d at 1135 (emphasis

added) (denial of an "acting" designation cannot be considered an adverse employment action

because "this type of temporary designation is not one of the terms, conditions, or privileges of

employment contemplated by Title VII"); *Smith v. District of Columbia*, 271 F. Supp. 2d 165,

172 (D.D.C. 2003) (temporary reassignment without diminution in pay and benefits is not an

adverse employment action). However, the denial of Plaintiff's request for the temporary EAS-

21 position could be construed as an adverse employment action if Plaintiff's pay would have

been increased, or if such a temporary position could have led to greater promotion opportunities

down the road. Even assuming *arguendo* that this denial of a temporary position was sufficient

to constitute an "adverse employment action," Plaintiff's *prima facie* case still fails because she

is unable to establish the requisite causal connection between this denial and her protected EEO

activity. Simply, Plaintiff's March 2001 EEO complaint had no connection to Mr. Worthy and

was submitted over two years prior to this denial. Plaintiff presents no direct evidence

connecting Mr. Worthy to any retaliatory motivations arising from that activity, and no retaliatory

inference is to be inferred given the significant time passage and change in supervisors. As such,

43

Plaintiff's claim fails.

Traveler's Check Investigation and Suspension:  Finally, Plaintiff cites the fact that

because the Postal Service suspended her from work in early 2004, she has been "materially

disadvantaged" for retaliatory reasons.  Pl.'s Opp'n at 20.  Plaintiff contends that she was

subjected to "pervasive and severe working conditions" when her supervisors "blamed her for the

stolen checks," i.e., the $300 in American Express Traveler's Checks that Plaintiff withdrew in

late 2003 and planned to use "to buy McDonald's certificates and buy some things in the postal

store" for herself and others in the Department but failed to record.  Def.'s Stmt. ¶ 38; Pl.'s Stmt.

¶ 38; Def.'s Mot. for Summ. J., Ex. 2 (Singleton Dep.) at 58:14-16.  Certainly, the fact that the

Postal Service conducted a routine investigation of the American Express Traveler's Check log,

initiated a search of Plaintiff's desk, and interviewed Plaintiff -- the person responsible for the

checks -- as to their whereabouts is not sufficient to constitute an adverse employment action;

Plaintiff suffered no change in employment status due to these steps, and such scrutiny was

certainly warranted given Plaintiff's apparent conversion of Postal Service property.  However,

the subsequent suspension of Plaintiff does rise to the level of an actionable adverse action, even

if it may well be justified.  Despite this fact, Plaintiff's retaliation claims fails once again because

Plaintiff has failed to introduce any admissible or relevant evidence that the Postal Service

practiced any age discrimination or retaliation against her by placing her on administrative leave

with pay in March 2004 while it investigated the possibility of her misappropriation.  Indeed,

Plaintiff has proffered no direct evidence suggesting that this suspension was in any way

connected to her protected EEO activity -- i.e, her March 2001 complaint.  Given that nearly

three (3) years had passed between her complaint and her suspension on unrelated grounds, any

inference of causal connection is also unwarranted.  Given that Plaintiff has failed to compile any evidence that her suspension was the result of age discrimination or retaliation, her claim must fail.

Taken as a whole, Count II of Plaintiff's First Amended Complaint, which alleges wrongful retaliation in violation of the ADEA, must be dismissed.  The nine alleged episodes that Plaintiff identifies as supporting her retaliation claim fail to amount to a *prima facie* case of retaliation, as each of these episodes is either insufficient to constitute an "adverse employment action" and/or lacks the requisite causal connection to her one instance of protected activity -- her March 2001 EEO complaint regarding age discrimination in her non-selection to an EAS-21 position.  As such, even if Plaintiff had followed the proper procedures and pursued her administrative remedies with timeliness, her retaliation claims would still fail and merit dismissal.

ii.    *Retaliatory Hostile Work Environment*

To establish a claim of a hostile work environment, a plaintiff must offer evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct.367, 126 L.Ed.2d 295 (1993).  As such, the plaintiff must demonstrate:  (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action.

45

*See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 120 (D.D.C. 2004) (citing cases).  In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris*, 510 U.S. at 23).  While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).  In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that [the ADEA, like Title VII] does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).  Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"  *Id.* (citations omitted).  "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." *Stewart*, 275 F.3d at 1134 (citing *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) ("holding that the fact that alleged incidents were spread over a seven-year period suggested that the harassment was not sufficiently pervasive to establish [] Title VII liability"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) ("holding that nine incidents spread over seven months did not constitute sexual harassment because the supervisor never touched employee and incidents were not sufficiently

severe or pervasive")).

As noted when discussing retaliation, Plaintiff cites to nine specific incidents as the basis for her hostile work environment claim:  (1) an apparent increase in workload; (2) Mr. Koukos's comment regarding the "problems" faced by the aged that she overheard when he was speaking about another employee; (3) the alleged $50 decrease in her spot bonus; (4) the extra scrutiny given to Plaintiff's attendance and office movements; (5) the selection of Ms. Nash rather than Plaintiff for an EAS-11 secretarial position in November 2001 because Ms. Nash's previous position was "RIFed"; (6) Mr. Worthy's decision to assign Plaintiff to clean out three cubicles and sort the materials contained therein in preparation for new employees; (7) the requirement that Plaintiff bring a doctor's note despite the fact that she used annual leave for a bursitis condition; (8) Mr. Worthy's decision not to afford Plaintiff a temporary EAS-21 Training Specialist detail, and his alleged comment that Plaintiff "should just retire" and that "he wouldn't give [her] a 21 job anyway"; and (9) the investigation and subsequent suspension of Plaintiff due to alleged improprieties involving American Express Traveler's Checks.  *See supra* Section II(B).

Assuming *arguendo* that Plaintiff had brought her retaliatory hostile work environment claim before this Court in a timely manner, having exhausted all of her required administrative remedies, it is clear that an application of these standards to Plaintiff's allegations leaves no doubt that her claim regarding a hostile work environment must fail.  Plaintiff's allegations, taken together as true for the purposes of this motion, show that Plaintiff experienced infrequent discomfort at work due to extra attention resulting from her frequent tardiness; a heightened workload that corresponded with "reductions in force" occurring in the Department; rare but

insensitive comments made by her superiors; duties that she felt were beneath her standing; non-

selection to two positions; a workplace investigation to ensure proper accountability; and regular

performance criticism.  These complaints are insufficient to establish a hostile workplace for

multiple reasons.  First, Plaintiff does not -- and cannot -- relate her allegations of "hostility" in

any way to her age or protected EEO activity.  Second, even if Plaintiff could connect these

actions to some kind of underlying age-motivated or retaliation-based animus, she has failed to

establish the existence of a workplace "'permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'"  *Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (citations omitted).  The evidence does not

substantiate the presence of "extreme" conduct that "amount[s] to a change in the terms and

conditions of employment."  *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275.  In sum, Plaintiff's

complaints revolve around what can best be characterized as "ordinary tribulations of the

workplace" that are not actionable.  *Id.*

   This case is reminiscent of *Bryant v. Brownlee*, 265 F. Supp. 2d 52 (D.D.C. 2003),

wherein the Court analyzed the hostile work environment claims of a plaintiff who complained

that

> she was criticized for not completing assignments more promptly; that her name
> was listed last on group emails; that her supervisor told her it was common
> courtesy to give advance notice of leave that would be taken; that her supervisor
> took 17 days to send out her workmen's compensation forms; that she was
> subjected to gossip; and that her supervisor singled her out for a special meeting
> and inferred that she was a difficult person with whom to work.

*Id.* at 69.  The *Bryant* court concluded that claims such as these -- which are similar to many of

Plaintiff's allegations -- must fail because "of course Title VII is not a 'general civility code' and 'many bosses are harsh, unjust, and rude.'" *Id.* (citations omitted).  Similar to *Bryant*, the incidents of which Plaintiff complains regarding workplace scrutiny and infrequent, somewhat offensive generalizations are simply too mild and too common in many workplaces to constitute "an abusive working environment" that provides a basis for a Title VII claim.  *See Faragher*, 524 U.S. at 787-88, 118 S.Ct. 2275; *Oncale*, 523 U.S. at 78, 118 S.Ct. 998; *see also Brodetski*, 141 F. Supp. 2d at 48-49 ("Many of the alleged incidents, while unpleasant, amounted to little more than everyday workplace disputes.").  Indeed, the most of the instances cited by Plaintiff, while perhaps uncomfortable, do not rise to the level of adverse employment actions, *see supra* Section III(B)(2)(i), and the few adverse actions lack any causal connection to Plaintiff's protected EEO activities or her age, *id.*  These unpleasantries were infrequent, relatively mild, not physically threatening, and had little impact of Plaintiff's day-to-day performance.  Accordingly, Plaintiff's claim for retaliatory hostile work environment must fail.

## IV:  CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted. An Order accompanies this Memorandum Opinion.


Date:   July 22, 2005

                                        _____/s/_____
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge